UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

                         *Plaintiff*,                     :

                  - against -                 :

                                               **13 CR 440 (KAM)**

ERCAN FINDIKOGLU, et al.,              :

                      *Defendant*.            :

-----------------------------------------------------------------X

---

## SENTENCING MEMORANDUM ON BEHALF OF
## ERCAN FINDIKOGLU

---

Christopher Madiou, Esq.
233 Broadway, Suite 2208
New York, NY 10279
(917) 408-6484
*chris@madioulaw.com*

1

## Introduction

This memorandum is submitted in mitigation of sentence on behalf of Ercan Findikoglu, who will be sentenced by the Court on February 7, 2017. On March 1, 2016, the Defendant appeared before Your Honor and entered pleas of guilty to the following Counts of the above-captioned indictment: Count 1, in violation of 18 U.S.C. § 371 (Computer Intrusion Conspiracy); Count 8, in violation of 18 U.S.C. §§ 1029(b)(2), 1029(a)(1), 1029(a)(2), 1029(a)(5) and 1029(c)(1)(A)(ii) (Access Device Fraud Conspiracy); and Counts 10, 12 and 14, in violation of 18 U.S.C. §§ 1029(a)(5), and (c)(1)(A)(ii) (Effecting Transactions with Unauthorized Access Devices).[1] As a part of his plea agreement, Mr. Findikoglu stipulated to facts,[2] agreed to a forfeiture money judgment in the amount of $55,080,226.14,[3] consented to the forfeiture of $15,878 (14,000 euros) seized at the time of his arrest,[4] paid $10,000 toward the outstanding forfeiture money judgement,[5] and accepted a four-level leadership role adjustment pursuant to U.S.S.G. §3B1.1(a).[6]

The Pre-Sentence Report ("PSR"),[7] following the parties' Guidelines stipulation, concludes that Mr. Findikoglu's adjusted offense level is 33.[8] In Criminal History Category I, Mr. Findikoglu faces a presumptive Guideline imprisonment range of 135-168 months.[9] As discussed below, we believe a below-Guidelines sentence would be sufficient but not greater

---

[1] PSR ¶¶ 1-6.
[2] Attached hereto as Exhibit A
[3] PSR ¶ 77.
[4] Addendum to the PSR p. 2.
[5] *Id.*
[6] PSR ¶ 31.
[7] I have reviewed the PSR with Mr. Findikoglu; we have made factual corrections and clarifications to Probation, all of which have been incorporated into the final PSR. None of these affected the calculation of the Guidelines range.
[8] PSR ¶ 37.
[9] PSR ¶ 67.

than necessary to achieve the goals of 18 U.S.C. §3553(a) considering (1) his unique personal history and family circumstances, (2) his pending 19-and-a-half year sentence in Turkey, and (3) sentences which have been already imposed on Mr. Findikoglu's co-defendants by the Court.

Mr. Findikoglu has admitted to the Your Honor and to Probation that his crimes were brazen, misguided and utterly inexcusable. He will face many years in custody alone, in a foreign country, separated from his aging mother, siblings, wife and five-year-old son. When he is finally extradited to his home country of Turkey, he will serve an additional 19-and-a-half years' imprisonment for a Turkish conviction which pre-dates the instant offense. Mr. Findikoglu has made clear that he accepts full responsibility for his crimes and stands ready to be punished.

## I.   Background

### a.   The Offense Conduct

From approximately July 2010 through February 2013, Mr. Findikoglu, along with other co-conspirators—many uncaptured and still at large—conspired to use sophisticated intrusion techniques to hack the computer networks of three credit and debit card payment processors: Fidelity National Information Services, Inc., ElectraCard Services and enStage. After the computer networks were breached, Mr. Findikoglu and other co-conspirators, targeted autonomous prepaid debit cards serviced by the payment processors.[10] Then, Mr. Findikoglu and others breached the security protocols that limited the amount of money that could be withdrawn on such cards, increasing the account balances on those cards to allow withdrawals in excess of the card balances. Because of this effective elimination of withdrawal limits, these cyber-attacks were known as "unlimited operations."[11]

---

[10] These accounts were not associated with personal accounts, therefore, there is no victim related adjustment. PSR ¶ 30.
[11] Exhibit A ¶ 2.

After eliminating the card balances, Mr. Findikoglu and his co-conspirators, disseminated the card data to leaders of "cashing crews" around the world, through internet channels. These crews consisted of individuals known as "cashers" who would withdraw monies from ATMs using the compromised card data. The leaders of these cashing crews were responsible for planning, organizing and executing the "cash-outs."[12]

Mr. Findikoglu is held accountable for a $10,024,539.00 loss from the FIS operation, a $4,743,202.43 loss from the ECS/Rakbank operation, and a $40,312,484.71 loss from the enStage/Bank Muscat operation. These loss amounts correspond to a 22-level enhancement, pursuant to U.S.S.G. §2B1.1(B)(1)(L).[13] Mr. Findikoglu's offense conduct occurred outside the United States, therefore two levels are added pursuant to U.S.S.G. §2B1.1(B)(10)(B).[14] Two more levels are added because the offense conduct involved using device-making equipment pursuant to U.S.S.G. §2B1.1(b)(11)(A)(i). Finally, because Mr. Findikoglu was one of the conspiracy's organizers, four levels are added pursuant to U.S.S.G. §3B1.1(a).[15]

b. The Defendant

Certainly nothing about Mr. Findikoglu's involvement in the world of cybercrime commends itself to the Court. While immensely skilled and wildly intelligent,[16] he has used those gifts for personal gain and profit. However, while his conduct in the instant conspiracy is indeed aggravating, there are factors, including his unique personal history, which we believe should mitigate his sentence: he grew up with a strict, abusive father who died of cancer at an

---

[12] Exhibit A ¶ 4.
[13] PSR ¶ 21.
[14] *Id.*
[15] *Id.*
[16] Aside from being a master hacker, Mr. Findikoglu is also fluent in four languages, despite never attending college.

early age; at 18, he was thrust into the role of caregiver to a depressed and suicidal mother; and so, inhabiting cyber cafés and retreating into the anonymous world of the dark web was a home for him that he never had in the "real" world. These online forums, filled with brilliant, rogue hackers, were his escape and his refuge from life at home.

Ercan Findikoglu[17] was born in Kastamonu, Turkey on December 31, 1981 to Burhan Findikoglu and Naciye Kaygusuz Findikoglu.[18] He has two older brothers, Erhan Findikoglu (44) and Engin Findikoglu (42).[19] Ercan's family suffered the tragic loss of an additional older brother, Irfan, who died at age 7 from an accidental fall;[20] Ercan had not yet been born, but the household's grief over the incident was a fixture of daily life throughout his childhood.

Mr. Findikoglu was raised by a loving and supportive mother, but his father was a harsh disciplinarian and the cause of intense family strife and anxiety. From the time of Ercan's birth until his untimely death, Ercan's father was engaged in a long-term extramarital affair. His father lived with his mistress on and off throughout Ercan's childhood and the ongoing affair was a constant source of fighting and tension between his parents. The arguments became violent at times both with his mother and his brothers, who would regularly confront their father about the affair. Ercan's oldest brother, Erhan, got the worst of their father's temper: he would beat Erhan regularly and without provocation.[21] In contrast, Ercan and his brother Engin were beaten only when they misbehaved.[22] Their father would punch the boys, but was careful to never cause

---

[17] "Ercan" or "Mr. Findikoglu" herein.
[18] PSR ¶ 45.
[19] PSR ¶ 46.
[20] *Id.*
[21] PSR ¶ 48.
[22] *Id.*

visible injuries.[23] The eldest brother, Erhan, decided he couldn't live under the same roof and left home for a period of time, abandoning his younger brothers.[24]

When Ercan was twelve years old, his mother, despondent over her husband's ongoing affair, attempted suicide.[25] He arrived home from school that day with his mother noticeably absent. Ercan's brother informed him that their mother had overdosed on prescription pills and was in the hospital.[26] Five years later, Ercan's family received news that their father fell ill while traveling for work—he was diagnosed with terminal lung cancer. Ten months later, Ercan's father succumbed to his illness at age 52.

After his father's death, Ercan gave up academic pursuits and went to work to help support his mother. He started a cyber café with his brother in his hometown of Kastamonu which was kept open for approximately a year. Seeking a better opportunity, he then moved to Bodrum, Turkey, a popular tourist destination. In Bodrum, Ercan spent nights working in clubs as a kitchen worker and bartender and days working at cyber cafés. He sent almost everything he made back home to his mother. The ebb and flow of Bodrum's tourist seasons meant that Ercan often did not have enough money for rent and was often forced to sleep on the floors of cyber cafés or on the beach, weather permitting.[27]

It was during this time that Ercan fell in love with computers. He immersed himself in programming and code while working at cyber cafés and quickly discovered that he had great aptitude. The digital world was a welcome reprieve from being homeless and away from his

---

[23] *Id.*
[24] *Id.*
[25] PSR ¶ 47.
[26] *Id.*
[27] PSR ¶ 62.

family; he understood that his rapidly developing skills might provide the solution to his family's financial problems.

In 2001, Ercan was ordered by the Turkish government to sign up for mandatory military service. The timing was not ideal. Ercan was in the early stages of building his life in Bodrum: he had a good job working for an IT company, finally saved enough money to rent an apartment, and was still able to send a good amount of money back to his mother and brothers, who were still struggling to make ends meet in Kastamonu. In the Turkish military, Ercan was first assigned to special forces but was quickly elevated to roles where his computer skills were used to encrypt internal military communications. Military service in Turkey is not paid, so during his 15 months of service Ercan was wholly dependent on his family, who was also struggling.

After completing his military service, Ercan returned home to Kastamonu and went directly to work. He returned to the cyber cafés where he first discovered his aptitude for computers, but this time, determined to free his family from financial hardship, he began using his skills for financial gain and started down the path of a "black hat" hacker.

In 2008, after gaining notoriety and status in the insular online world of cybercrime, Mr. Findikoglu was arrested, detained and charged with participating in a conspiracy to produce fake debit and credit cards. He was jailed for 23 months while his case worked through the Ankara 11th Criminal Court of First Instance. Before the case was finally resolved, Mr. Findikoglu was granted release while the court rendered decision in his criminal trial.

In August of 2010, while Mr. Findikoglu was on release from his pending criminal matter, he met his future wife, Alena Kovalenko. They fell in love and were married in 2011. On November 11, 2011, Mrs. Findikoglu gave birth to their first and only child, a son.[28]

---

[28] PSR ¶ 52.

While Mr. Findikoglu was on release, he returned to his illicit, online communities and joined the instant conspiracy. In June of 2012, Mr. Findikoglu's criminal trial concluded—he was convicted and sentenced to 19-and-a-half years' imprisonment. He was permitted to remain on bail while his case was appealed and, again, he returned to the instant conspiracy.

In December of 2013, while his appeal was still pending, Mr. Findikoglu traveled to Germany to visit friends. On December 19, 2013 Mr. Findikoglu was arrested in Frankfurt, Germany on a provisional arrest request by the United States.[29]

On January 23, 2014, after losing his final appeal in Turkey and while Mr. Findikoglu was still being held for extradition in Germany, an arrest warrant was issued by the Chief Public Prosecutor's Office of Ankra.[30] His conviction and sentence was affirmed, and upon his extradition to Turkey he will be taken into custody for a period of 19-and-a-half-years.

## II.    __Argument__

The Guidelines attempt to restore justice after criminality and "further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation."[31] But there are inherent limitations to its formulaic approach, as the Sentencing Commission admits: "The appropriate relationships among [sentencing] factors are exceedingly difficult to establish, for they are often context specific. […] Thus, it would not be proper to assign points for each kind of harm and simply add them up, irrespective of context[.]"[32]

Mr. Findikoglu's Guidelines calculation, while stipulated to and correct, simply cannot account for his unique circumstances. It does not account for the absence of personal contact

---

[29] PSR p. 1.
[30] Attached hereto as Exhibit B.
[31] U.S.S.G. Ch. 1 Pt. A (2).
[32] U.S.S.G. Ch. 1 Pt. A (3).

with his wife and young son while is U.S. custody; and it certainly does not account for the almost 20 years Mr. Findikoglu will have to serve upon his extradition to Turkey.

However, 18 U.S.C. §3553(a)'s call is to go beyond the Guidelines: to consider not only the nature and circumstances of the offense, and the appropriate Guidelines range, but also the unique history and characteristics of each person. We respectfully submit that when the Court considers the totality of Mr. Findikoglu's circumstances, a below-Guidelines sentence is sufficient, but not greater than necessary to achieve the statutory sentencing goals.

     a.  <u>Consideration for Mr. Findikoglu's Family Circumstance While In Custody</u>

We believe that a variant sentence is appropriate, under §3553(a)(1), because Mr. Findikoglu will be unable to visit with his family while in the United States, making his incarceration significantly harder than most defendants. First, Mr. Findikoglu readily admits that he has no one to blame for his incarceration but himself. Indeed, Mr. Findikoglu was one of the organizers of a sophisticated hacking ring that greatly affected United States financial institutions. His stipulated Guidelines range accounts for this harm in a number of ways. First, he receives a four-level aggravating role adjustment for being one of the conspiracy's leaders (U.S.S.G. §3B1.1(a)). Second, he is increased by two-levels because the offense conduct took place outside the United States (U.S.S.G. §2B1.1(b)(10)(B)). Finally, and most importantly, 22-levels are added because the conspiracy created a total loss of $55,080,226.14 (U.S.S.G. §2B1.1(b)(1)(L)).

What is not accounted for, again, is the isolation he will suffer while incarcerated: he will be, and has been, imprisoned in a foreign country, utterly alone. His only contact with his loved ones is through a prison phone, surrounded by other inmates. This fact alone makes him unique

among the co-conspirators Your Honor has already sentenced in Mr. Findikoglu's companion case, 13 Cr. 259 (KAM).

The Bureau of Prisons ("BOP") recognizes the vital role of visitation by family and friends. The BOP "encourages visiting by family, friends, and community groups to maintain morale of the inmate and to develop closer relationships between the inmate and family members or others in the community."[33]  Additionally, numerous academic studies have shown that in-person family visits positively impacts a prisoner's well-being, drastically lowers rates of depression, and even reduces recidivism.[34]

Mr. Findikoglu has not seen his wife and son since December of 2013. He was unable to visit with his wife and young son while being held for extradition in Germany.[35] Since his extradition to the U.S., Mr. Findikoglu's wife and son have been twice rejected for U.S. visitor visas.[36] The last time Mr. Findikoglu set eyes on his son, he was only two years old. The suffering this has caused both Mr. Findikoglu and his family cannot be overstated.[37] Probation, providing justification for a variant sentence, states:

> The fact that the defendant has extremely limited contact with his family during
> his incarceration in Germany, and continues to be unable to see them during his
> incarceration in the United States, although not rising to the level of family

---

[33] BOP Program Statement: Visiting Regulations, §540.40, https://www.bop.gov/policy/progstat/5267_008.pdf (last visited January 19, 2017).

[34] *See*, *The Effects of Prison Visits From Family Members on Prisoners' Well-Being, Prison Rule Breaking, and Recidivism: A Review of Research Since 1991*, http://journals.sagepub.com/doi/10.1177/1524838015603209 (last visited January 19, 2017); *Lowering Recidivism through Family Communication*, https://www.prisonlegalnews.org/news/2014/apr/15/lowering-recidivism-through-family-communication/ (last visited January 19, 2017).

[35] While in Germany, all of Mr. Findikoglu's personal phone calls were monitored and he was only allowed to speak to his loved ones in German, a language he and his family did not speak. If he spoke in his native Turkish, a certified translator was required to be present while he was on the phone.

[36] PSR ¶ 52.

[37] The pained letters of Mr. Findikoglu's wife and mother are attached as Exhibit C.

circumstances that would warrant a departure from the guidelines, may be considered as grounds for a downward variance from the applicable guideline range.[38]

We agree. The quality of Mr. Findikoglu's incarceration, isolated in a foreign country without the ability of physical contact with his loved ones, is grounds, under §3553(a)(1), for a variant sentence. Additionally, we ask the Court to also keep in mind that Mr. Findikoglu will continue to be incarcerated, whenever he is released from U.S. custody, in his home country of Turkey for almost 20 years. He will, however, have the significant benefit of in-person visitation.

　　　　b.　Consideration for the Defendant's Pending Sentence in Turkey

In August of 2008, Mr. Findikoglu was arrested and charged in Turkey with offenses related to producing and using fake credit cards.[39] To be clear, this is not relevant conduct as defined in U.S.S.G. §1B1.3 and therefore the instant sentence cannot "run concurrently to the anticipated term of imprisonment" in Turkey.[40] However, we respectfully request that this anticipated period of 19-and-a-half-years' incarceration be considered by the Court when fashioning a reasonable sentence here.

It is appropriate to take this sentence into account because (a) it represents time in custody for substantially similar, but not identical, offense conduct (i.e., credit card fraud) and (b) the time will not, and cannot, be counted by the BOP; nor is it a "undischarged term of imprisonment" considered under U.S.S.G. §5G1.3. Additionally, the conditions under which Mr. Findikoglu will be detained in Turkey are *substantially* worse than here in the U.S..[41]

---

[38] PSR ¶ 81.
[39] *See*, Exhibit B.
[40] U.S.S.G. §5G1.3(c).
[41] *See*, *Torture and Abuse Rampant in Turkish Prisons, Despite Attempts at Reform*, PRI.org – October 19, 2012, https://www.pri.org/stories/2012-10-19/torture-and-abuse-rampant-turkish-prisons-despite-attempts-reform (last visited January 16, 2017); *Overcrowded Turkish Prisons are Reaching Their Breaking Point Amid Influx of Thousands of Detainees*, Business Insider –

Therefore, in fashioning a sentence which is sufficient, but not greater than necessary, and when considering all relevant factors, we respectfully ask that Mr. Findikoglu's pending 19-and-a-half year Turkish sentence be considered in the Court's § 3553(a) analysis.[42]

### c.   18 U.S.C. 3553(a)(6) Considerations

The Court is not writing on a blank slate when it sentences Mr. Findikoglu. To date, Your Honor has sentenced 13 of Mr. Findikoglu's co-defendants in 13 Cr. 259 (KAM). All 13 defendants have received a below-guidelines sentence. It is also true that Mr. Findikoglu is different than most of the co-conspirators the Court has sentenced. He is the only organizer who has been captured to date. He is the only defendant who has received a four-level enhancement under U.S.S.G. §3B1.1(a). And he is the only defendant who has taken responsibility for the full amount of the conspiracy's total loss. We do not ask for a sentence *similar* to those the Court has already imposed, but we do ask that Your Honor implement a similar *approach* when viewing Mr. Findikoglu's offense conduct and all the factors that both aggravate and mitigate.

---

August 4, 2016, http://www.businessinsider.com/turkish-penal-system-reaching-breaking-point-amid-post-coup-crackdown-2016-8 (last visited January 16, 2017); *Turkey: Emergency Decrees Facilitate Torture, Human Rights Watch* – October 25, 2016, https://www.hrw.org/news/2016/10/25/turkey-emergency-decrees-facilitate-torture (last visited January 16, 2017).

[42] Additionally, if Mr. Findikoglu were currently serving his Turkish sentence, he would potentially be eligible for a new prisoner release plan under which convicted, non-violent criminals, such as Mr. Findikoglu, who have served at least half of their sentences would be released on supervised parole. *Turkey to Release Tens of Thousands of Prisoners to Make Room for Coup Suspects*, The New York Times – August 17, 2016, https://www.nytimes.com/2016/08/18/world/europe/turkey-prisoners-erdogan.html (last visited January 16, 2017).

The Court has imposed the following sentences, thus far:

| Defendant | Guidelines Range | Sentence Imposed[43] |
|---|---|---|
| Elvis Rafael Rodriguez | 78 to 97 months[44] | 34 months' incarceration |
| Evan Pena | 57 to 71 months[45] | 22 months' incarceration |
| Emir Yasser Yeje | 57 to 71 months[46] | 18 months' incarceration |
| Saul Franjul | 46 to 57 months[47] | 16 months' incarceration |
| Saul Genao | 37 to 46 months[48] | 15 months' incarceration |
| Chung Yu-Holguin | 37 to 46 months[49] | 8.5 months' incarceration |
| Jose Angeley Valerio | 37 to 46 months[50] | 7.5 months' incarceration |
| Franklyn Ferreira | 37 to 46 months[51] | 6 months' incarceration |
| Anthony Diaz | 30 to 37 months[52] | 5 months' incarceration |
| Jael Mejia Collado | 10 to 16 months[53] | Time Served |
| Jaindhi Polanco | 37 to 46 months[54] | Time Served |
| Jose Familia Reyes | 30 to 37 months[55] | Time Served |
| Joan Luis Minier Lara | Unknown | Time Served[56] |

---

[43] Unless otherwise noted, *See*, PSR at p. 3.
[44] 13 Cr. 259 (KAM), Dkt. No. 281 at p. 4.
[45] *Id*., Dkt. No. 252 at p. 3.
[46] *Id*., Dkt. No. 330 at p. 3.
[47] *Id*., Dkt. No. 356 at p. 3.
[48] *Id*., Dkt. No. 256 at p. 3.
[49] *Id*., Dkt. No. 314 at p. 3.
[50] *Id*., Dkt. No. 361 at p. 3.
[51] *Id*., Dkt. No. 276 at p. 3.
[52] *Id*., Dkt. No. 351 at p. 3.
[53] *Id*., Dkt. No. 352 at p. 3.
[54] *Id*., Dkt. No. 331 at p. 3.
[55] *Id*., Dkt. No. 303 at p. 2.
[56] *Id*., Dkt. No. 409.

Again, Mr. Findikoglu is not seeking sentencing parity with the above-mentioned defendants, but rather a similar approach. Like the above defendants, Mr. Findikoglu had his own unique role in the offense, albeit an enhanced role. Like the above defendants, Mr. Findikoglu's share was a mere fraction of the total loss he is held accountable for. He is most closely situated to defendant Rodriguez, in that, Mr. Rodriguez appears to be the only sentenced defendant who had managerial role.[57] The distinction between defendant Rodriguez and Mr. Findikoglu is skill. Mr. Findikoglu's offense conduct is completely intertwined with his computer skills: he is a hacker. The skills he first developed in the cyber cafés of Kastamonu, and later honed in the Turkish military, are what gave him status in the online world of cybercrime. Those skills netted him connections to other likeminded hackers, and those connections afforded him the criminal opportunities which comprise the instant offense conduct. But as the cashing crews were dependent on the compromised credit card information, Mr. Findikoglu was dependent on the cashing crews and networks of money launderers which funneled proceeds back to him and the other leaders and organizers of the conspiracy, none of whom have been captured.

In fashioning a sentence that is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. §3553(a), we ask that the Court consider its determinations in the above cases and ask that the same approach be used when sentencing Mr. Findikoglu.[58] We also stress that

---

[57] "Rodriguez played an important, managerial role in this conspiracy. He was a trusted associate of the head of the New York crew, Lajud Pena." 13 Cr. 259 (KAM), Dkt. No. 281 at p. 4

[58] There are, of course, additional cases in this district where exceedingly high loss amounts have also resulted in a significant below-guidelines sentence. In this category, we point the Court to *U.S. v. Winick*, 13 Cr. 452 (ENV)(defendant sentenced to 6½ years for "masterminding two [global, penny stock fraud] schemes that fleeced investors of $140 million.") *See, Penny Stock 'Kingpin' Gets 6½ Years for Boiler Room Plot*, Bloomberg – August 17, 2016 https://www.bloomberg.com/news/articles/2016-08-17/penny-stock-kingpin-gets-6-1-2-years-for-boiler-room-plot (last visited on January 21, 2017).

the Guidelines' "overwhelming focus" on a single sentencing factor, here the loss amount, is based at least in part on the fact that it is simply easier to measure than other, equally important factors.[59]   Accordingly, the cost of treating loss as the "be all and end all" is that the resulting Guidelines range, which is then taken into account under §3553(a), will not "fairly convey the reality of the crime or the criminal."[60]

> d.   A Reasonable Sentence

The Supreme Court has said that the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[61] The district court must make an "individualized assessment" of the sentencing warranted by §3553(a) "based on facts presented" and "may not presume that the Guidelines range is reasonable."[62] The deference granted to a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as "its familiarity with the individual case and the individual defendant before it."[63]

Here, when considering all relevant factors, a variant sentence, below 135 months is a sufficient sentence for Mr. Findikoglu's criminal conduct, but not greater than necessary, given Mr. Findikoglu's turbulent upbringing, his isolation from his family here in the United States and his pending sentence in Turkey which will add two decades' incarceration to whatever the Court imposes here. We ask the Court to consider the sentences already imposed in 13 Cr. 259 (KAM)

---

[59] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines should be Scrapped,* 26 Fed.Sent.R. 6, 7 (2013).
[60] *Id.*, at p. 7.
[61] *Pepper v. United States*, 562 U.S. 476, 487 (2011)(*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).
[62] *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008).
[63] *Id*. at 170.

and request that a similar approach be used to determine a reasonable sentence for Mr. Findikoglu. When viewing all relevant factors, we respectfully submit that a variant, below-guidelines sentence is warranted.

### III.    Conclusion

Mr. Findikoglu has accepted full responsibility for his offense conduct and stands ready for punishment. His crimes were brazen and driven by greed and personal gain. But he is also a young, family man who is eminently redeemable; a young man who can one day live a productive, instructive life, after he emerges from prison. As his family's letters show, he will have tremendous support and encouragement, to do just that.

In closing, we wish to observe that there is—or there should be—a place in criminal sentencing for Mercy. Mercy for a young man who will suffer incarceration in a foreign country, away from his loved ones and young son, and who will serve even more time once he is returned to Turkey. Mercy is not a word found in the Sentencing Guidelines, and it is likewise not to be found in 18 U.S.C. §3553(a). But, we believe, there is a role for it in connection with sentencing. Yes, punishment promotes respect for the law; and yes, punishment is instructive to others. But we believe that mercy shown to Ercan Findikoglu would also promote respect for the law, and would instruct others that fairness and individualized sentencing determinations are possible.

Respectfully submitted,

Christopher Madiou, Esq.
*Counsel for Ercan Findikoglu*

New York, New York
January 24, 2017

Exhibit A



COURT'S
EXHIBIT NO. 2
IDENTIFICATION/EVIDENCE
DKT.# 13cr 440
DATE: 3/1/2016

SDD:HLJ
F. #2013R01131

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against –

ERCAN FINDIKOGLU,

         Defendant.

– – – – – – – – – – – – –X

<div style="text-align:right">

STIPULATED FACTS

13 CR 440 (KAM)

</div>

IT IS HEREBY STIPULATED AND AGREED by and between the UNITED

STATES OF AMERICA and the defendant ERCAN FINDIKOGLU by his attorney that:

    1.    The defendant ERCAN FINDIKOGLU ("FINDIKOGLU") is a

34-year-old Turkish citizen.   He is also known as "Segate," "Predator" and "Oreon."

    2.    From approximately July 2010 through February 2013, FINDIKOGLU,

together with others, agreed to use sophisticated intrusion techniques to gain unauthorized

access to – i.e., "hack" – the computer networks of at least three credit and debit card payment

processors: Fidelity National Information Services, Inc. ("FIS"), ElectraCard Services

("ECS") and enStage (together, the "Victim Processors").   Upon gaining unauthorized access

to these computer networks, FINDIKOGLU and other co-conspirators, targeted Visa and

MasterCard prepaid debit cards serviced by the Victim Processors (the "Compromised

Cards"), breached the security protocols that limit the amount of money that can be withdrawn

on such cards, and then dramatically increased the account balances on those cards to allow

withdrawals far in excess of the legitimate card balances.   As a result of this effective

elimination of withdrawal limits, these cyber-attacks were known as "unlimited operations."

3.      During these cyber-attacks, FINDIKOGLU and other co-conspirators

also obtained and manipulated various forms of security credentials in the networks of the

Victim Processors, including network administrator privileges and the personal identification

numbers ("PINs") associated with the Compromised Cards.

4.      After successfully manipulating the balances of the Compromised

Cards, FINDIKOGLU and his co-conspirators disseminated the stolen financial information

globally via the Internet and other means to trusted associates who were leaders of "cashing

crews" around the world.   The cashing crews consisted of individuals known as "cashers" or

"cashiers."   The leaders of these crews were responsible for planning, organizing and

executing the "cash-outs," in which the cashers conducted hundreds and even thousands of

fraudulent transactions over a matter of hours via automated teller machine ("ATM")

withdrawals and fraudulent purchases using plastic cards encoded with stolen account

information.   FINDIKOGLU and his co-conspirators also distributed the PINs for the

Compromised Cards and directed co-conspirators worldwide to execute the fraudulent

withdrawals.

5.      Throughout the course of these activities, FINDIKOGLU and his

co-conspirators maintained unauthorized access to the Victim Processors' networks in order to

monitor the withdrawal amounts and locations.   FINDIKOGLU expected to be paid, and was

paid, a significant portion of the illegal proceeds from these unlimited operations.

FINDIKOGLU and his co-conspirators sent transaction logs obtained directly from the Victim

Processors to co-conspirators to show how much money had been withdrawn and, accordingly, how much money they were owed.   FINDIKOGLU was paid from the proceeds of the unlimited operations in various forms, including by wire transfer, electronic currency and the personal delivery of currency.   On multiple occasions, such payments were transported, transmitted and transferred from the United States to and through places overseas, including, Romania and Ukraine.

II.    The FIS Unlimited Operation

6.    Between December 2010 and March 2011, FINDIKOGLU gained unauthorized access to FIS, a payment processor based in Florida.   Once inside the victim network, FINDIKOGLU and his co-conspirators were able to obtain unauthorized access to an FIS prepaid debit card database, among other things.   FINDIKOGLU and his co-conspirators then breached security protocols and increased the withdrawals limits on more than 20 prepaid cards issued by JPMorgan Chase (the "Compromised FIS Cards").   FINDIKOGLU and his co-conspirators distributed the data for the Compromised FIS Cards to other co-conspirators around the world who encoded the account information onto plastic cards with magnetic strips. FINDIKOGLU instructed these co-conspirators to gather crews of cashers who could withdraw money at an appointed time.   When the crews were assembled, FINDIKOGLU distributed the PIN numbers via text message to the leaders of the cashing crews.

7.    On February 27 and 28, 2011, the Compromised FIS Cards were used in approximately 15,000 transactions to withdraw approximately $10,024,539.00 in at least 18 countries.   Some of these transactions were conducted in the Eastern District of New York, among other locations within the United States.

3

8.    FINDIKOGLU had access to the FIS network database and watched as the money was withdrawn.   He could tell if the Compromised Cards were being used somewhere he had not authorized their use and could shut them off.   In online communications about the FIS Unlimited Operation on or about March 5, 2011, FINDIKOGLU stated to a co-conspirator that he had had "control over all this."

9.    FINDIKOGLU was paid for the FIS Unlimited Operation via wire transfer and cash, among other methods.

III.    The ECS/RAKBANK Unlimited Operation

10.    In December 2012, ECS, a payment processor based in India, was the victim of a network intrusion.   As a result, FINDIKOGLU and his co-conspirators were able to obtain unauthorized access to an ECS prepaid debit card database, among other things. They breached security protocols and increased withdrawals limits on prepaid cards issued by the National Bank of Ras Al-Khaimah PSC, also known as "RAKBANK," located in the United Arab Emirates (the "Compromised ECS Cards").   FINDIKOGLU and his co-conspirators distributed the data for the Compromised ECS Cards to leaders of the cashing crews around the world.

11.    On December 21 and 22, 2012, the Compromised ECS Cards were used in approximately 5,000 transactions to withdraw approximately $4,743,202.43 in at least 20 countries.   Some of these transactions were conducted in the Eastern District of New York, among other locations within the United States.

12.    FINDIKOGLU was paid via wire transfer, among other methods.   At FINDIKOGLU's direction, cash proceeds from fraudulent withdrawals made in New York in

4

the course of the ECS/RAKBANK Unlimited Operation were personally transported from Queens, New York, to co-conspirators in Romania by New York-based cashers who participated in the operation.

IV.   The enStage/Bank Muscat Unlimited Operation

13.   In February 2013, enStage, a payment processor based in California, was the victim of a network intrusion.   As a result, FINDIKOGLU and his co-conspirators were able to obtain unauthorized access to an enStage prepaid debit card database, among other things.   As with the unlimited operations listed above, security protocols were breached and withdrawal limits on prepaid cards issued by Bank Muscat in Oman were increased (the "Compromised enStage Cards").   FINDIKOGLU and his co-conspirators distributed the data for the Compromised enStage Cards to the leaders of cashing crews around the world.

14.   On February 19 and 20, 2013, the Compromised enStage Cards were used in approximately 36,000 transactions to withdraw approximately $40,312,484.71 in approximately 24 countries.   Some of these transactions were conducted in the Eastern District of New York, among other locations within the United States.

15.   FINDIKOGLU was paid via wire transfer, among other methods.

16.   The facts detailed above serve only as a summary of the evidence were this case to proceed to trial and are not intended to be an exhaustive account of all the evidence

5

available to the government concerning the offenses charged in the Indictment in the

above-captioned case.


Dated: Brooklyn, New York

_March 1_ , 2016


<div style="margin-left: 40%">

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

By: _____

Hilary Jager
Assistant United States Attorney

Approved by: _____


Seth DuCharme
Supervising Assistant U.S. Attorney

</div>

I have read the entire stipulation and discussed it with my attorney.   I understand all of its
terms and am entering into it knowingly and voluntarily.


_____

ERCAN FINDIKOGLU
Defendant

Approved by: _____

Christopher Madiou, Esq.
Counsel to Defendant

# Exhibit B

03/02/2014  17:59    03124180003          SOZLESMELER.COCUK.BR                    PAGE  03/04

# ARREST WARRANT
## (SPECIAL TO CONVICTS)
## TO THE BRANCH OF WANTED PERSONS
### ANKARA

**Chief public Prosecutor's Office Issuing the Arrest Warrant:** Ankara Chief Public Prosecutor's Office

**Verdict No:** 2014/2-1618

**Convict's:**

| | |
|---|---|
| Turkish ID Number | : 56857086780 |
| Name and Surname | : ERCAN FINDIKOĞLU |
| Father's Name | : BURHAN |
| Mother's Name | : NACİYE |
| Date of Birth | : 15/06/1982 |
| Registered at | : |
| Province | : KASTAMONU |
| District | : DEVREKANİ |
| Settlement/Village | : ÇAYIRCIK VIL. |
| Volume No | : 2 |
| Family Serial Number | : 11 |
| Sequence No | : 85 |

**Permanent Address** : Detained in F Type 1 No High Secured Prison Sincan /ANKARA

**Office Address** :Cumhuriyet Cad. Dr. Alibey Bedesteni Sat – Koop Travel Bodrum / MUĞLA

**Telephone** :

**The court rendering decision** : Ankara 11th Criminal Court of First Instance

**Docket No** : 2009/1151

**Decision No** : 2012/921

**Amount of Penalty** : IMPRISONMENT FOR 10 YEARS 2 MONTHS 15 DAYS, IMPRISONMENT FOR 6 MONTHS, IMPRISONMENT FOR 8 YEARS 9 MONTHS, JUDICIAL FINE FOR 175,000 TL AND 87,500 TL

**Offence** : Establishing and Managing Organization for Committing Crime Producing Fake Debit and Credit Cards by Linking to Accounts of Other Persons, Providing Undue Advantage by Using the Fake Debit and Credit Cards

**Date of Offence** : 21/08/2008

Aslına uygun çevrilmiştir.
The translation is true, accurate and correct to the best of my knowledge and ability.
Ayşe Esra GÜNEŞ    Mütercim/Translator

**Place of Offence**                    : ANKARA

This is the arrest warrant for the arrest of the convict whose clear identity is written above to serve his sentence.

**When he is caught, he is to be delivered to the nearest Chief Public Prosecutor's Office.**
23/01/2014

GÖKÇER DUMAN 47426                    SEMA SONAY GÖKŞEN 29295

    Chief Clerk                            Public Prosecutor

Aslına uygun çevrilmiştir.
The translation is true, accurate and correct to the best of my knowledge and ability.
Ayşe Esra GÜNEŞ  Mütercim/Translator

# Exhibit C

January 13, 2017

Dear Honorable Judge Matsumoto,

I am writing this letter to urge leniency in the sentencing of my husband Ercan Findikoglu .I met in summer 2010 and all this time we were inseparable. All these years I did not see him  other then very honest, like to work, loving and caring person, always ready to help others  when they are in need, always putting interests of his family higher then his own. I never saw him hurting someone or telling lies. He was always so friendly to everybody. But as he stands in front of You, means he did something wrong.

Since we have been together we were so happy and we were created our family with love and respect to each other. Of course, like all normal people, we had our highs and lows, but  this  one is  really hard on our family. We have a 5 years old son together, who did not saw his father already more than 3 year and as much he is growing, as much more he need his father near, as much he miss his father. I was grown up without father too, because he dead when I was 3 year, and I was always dream about full family which is living with love and happiness. When Ercan got arrested my world fell apart. It was as a nightmare when we  left  with our 2 years old son alone in foreign country. We were pass through many difficulties during this time, but the must heaviest it is stay separate as a family. It is really hard to grown child without father. I am still  in shock, but trying hard to hide my feelings from our son .Two time i was trying to get American visa to visit him with our son, but we got refused two time. We are talking on the phone often and my husband can not stop telling me how sorry he is for what has happened, he regrets it very much. Even through our phone talks he still supporting , trying to keep good contact with our little son.

If my husband was incarcerated somewhere close to us, at less we were going  to have a chance to see each other and be  close physically  to each other, so that way we can pass this hard days for our family with minimum damage. I could at less hugs my husband and take a his smell which i already forget in this 3 year , same for Our son too ...because he know his father just throw telephone and old photo which we have.

Your Honor, I am not asking forgive to my husband, what he did was not correct .With right directions he could use his skills for good .  As a woman, as a mother and a wife, I am asking  You for the lightest possible sentence for him, so we can reunite and raise our son together.

Thank You, Your Honor, for Your time in reading this. I wanted to speak from my heart  and hope You will forgive the informality of this letter. I beg You to please consider my letter   when You hand down Your sentence. Only You have the ability to give my husband a second chance.


Sincerely   Alena Kovalenko

January 19, 2017

Dear Honorable Kiyo Matsumoto,

I write this letter, to forbearance in the condemnation of my son to urge Ercan Findikoglu he was born in 1982. All these years I did not see him other then very honest, hardworking, loving and caring person, always willing to help others when they are in need, always the interests of other people higher than his own. I never saw that he was doing something wrong, hurt someone, or even told lies. But since he stands before you, he has done something wrong. He still has two older brothers. My husband died in 1998. My son was still very young he can not handle it and left 1998 the parents house to go to work he is also Moved to another city where is also very far Since we were together, we had our ups and downs, but this is really hard for our family. He has always cared for us. In 2004-2008 he lived abroad I did not even see him where he came back, he was arrested in Turkey bi 2010 June. This some positive I was able to visit him. Since he was arrested in Germany in 2013 I do not see him and also in the 2 years In Germany was the telephone very rarely. I am already very old and very sick. Since 2013 I have already 3 operations behind me. I have heart problem Panic Attacks Psyche problems. Because of these problems I could not visit my son in Germany and not America. If he was in Turkey I could at least still visit. Today often talk on the phone and my son can not stop telling me how sorry he is for what happened, he regrets it very much. Your honor, my son is very young and has a small son where He has not seen for more than 3 years, it also hurts my heart as a mother. He was never involved in any criminal activities, so as a mother, I ask you for the easiest possible punishment for him so I can still see him in my life. I am very sick and very old. My son is a very giving person, he helped numerous children in our town with school books and clothing, although he never talks about it. He helps our family very much. He has raised money for charity and he certainly does not pose a threat to the community. Thank your honor, for your time while reading this. I wanted to speak out of my heart and hope that you will forgive the informality of this letter. I ask you to consider my letter when you pass your judgment. Only you have the opportunity to give my son a second chance.

Best regards,
Naciye Findikoglu
Born on 3 March 1948